# UNITED STATES DISTRICT COURT
## Southern District of Florida

Case Number: _____

# 06-80278

Edward Frederick
_____
Name of Petitioner (include name under which convicted)

W12029
_____
Prisoner No.

Okeechobee Correctional Institution
_____

3420 N.E. 168th Street
_____

Okeechobee, Florida 34972-4824
_____
Place of Confinement

v.

James C. McDonough, Interim Secretary,
Florida Department of Corrections
_____
Name of Respondent (authorized person having custody of petitioner)

Charles J. Crist, Jr.
_____
Attorney General of the State of Florida

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

1. Name and location of court which entered the judgement of conviction under attack   The Circuit Court
   Fifteenth Judicial Circuit, Palm Beach County, Fla. (Case No. 98-9283-CFA02)

2. Date of judgement of conviction   October 7, 1999 (resentenced on August 9, 2002)

3. Length of sentence   Cts 1, 2 - life; Cts 3, 5, 7 - 66, 54, & 54 mo., all concurrent

4. Nature of offense involved (all counts)   Counts 1 and 2 - sexual battery on a person under
   12; Counts 3, 5 and 7 - lewd assault on person under 16.

5. What was your plea? (Check one)

   (a) Not guilty  ☒
   (b) Guilty  ☐
   (c) Nolo Contendere  ☐

If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

_____

_____

6.  If you pleaded not guilty, what kind of trial did you have? (Check one)

    (a)  Jury        ☒

    (b)  Judge only    ☐

7.  Did you testify at the trial?

    Yes ☐        No ☒

8.  Did you appeal from the judgement of the conviction?

    Yes ☒        No ☐

9.  If you did appeal, answer the following:

    (a)  Name of Court  Fourth District Court of Appeal of Florida

    (b)  Result  Remanded for resentencing on sentencing error; Other claims denied.

    (c)  Date of Result and citations, if known  April 19, 2002, *Frederick v. State,* 814 So.2d 1123 (Fla. 4th DCA 2002)

    (d)  Grounds raised  See attached page 3a

    _____

    (e)  If you sought further reviews of the decision on appeal by a higher state court, please answer the following:

        1.  Name of Court _____

        2.  Results _____

        _____

        3.  Date of result and citation, if known _____

        4.  Grounds raised _____

        _____

    (f)  If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

        1.  Name of the court _____

        2.  Results _____

        _____

        3.  Date of result and citation, if known _____

        4.  Grounds raised _____

        _____

10.  Other than a direct appeal from the judgement of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgement in any court, state of federal?

    Yes ☒        No ☐  State court only

9.   (d) Grounds raised  1) The charges and verdicts fail to establish the essential element of the victim's age to support conviction for capital sexual battery;

2) The religious-based peremptory challenges violate guarantees of equal protection, freedom of religion, and an impartial jury, where they are based on religious practice and not on articulated beliefs indicating bias or an inability to follow the law;

3) Acquittal of lewd assault requires discharge on the capital sexual battery count which covers the same allegations and proof;

4) Conviction of lewd assault for the same conduct and allegations comprising a count of capital sexual battery requires vacation of one of the convictions;

5) The prosecutor's reference to petitioner retaining counsel when under suspicion and prior to questioning requires a new trial;

6) The trial court unlawfully restricted impeachment of the key witness;

7) The trial court improperly admitted prior consistent statements of the complainant which unlawfully bolstered her testimony;

8) The trial court erred in admitting hearsay statements of petitioner's wife;

9) Fundamental error occurred where the jury was improperly instructed on union as an alternative to penetration;

10) The sentences must be vacated and petitioner must be resentenced pursuant to the guidelines;

(a) The state's failure of proof or the lack of a jury finding of the defendant's age requires resentencing pursuant to the guidelines on all counts;

(b) Improper general sentence combining counts;

(c) Written sentence for Counts 1 & 2 improperly omits parole eligibility;

(d) The lewd assault counts were incorrectly scored;

(e) Other errors on lewd assault counts;

(f) Sexual Predator finding unlawful.

11.  If you your answer to 10 was "yes," give the following information:

    (a)  1.  Name of court __Circuit Court of the Fifteenth Judicial Circuit, Florida__

        2.  Nature of proceeding __Motion for Postconviction Relief via Rule 3.850__

        3.  Grounds raised __See attached page 4a__

        4.  Did you receive an evidentiary hearing in your petition, application or motion?

            Yes ☐         No ☒

        5.  Result __Denied__

        6.  Date of result __March 29, 2004__

    (b)  As to any second petition, application or motion, give the same information:

        1.  Name of court __Circuit Court of the Fifteenth Judicial Circuit, Florida__

        2.  Nature of proceeding __Motion for Correct Illegal Sentence via Rule 3.800(a)__

        3.  Grounds raised __Counts 1 and 2 are second degree felonies, not Life felonies according to Information and jury verdict. therefore sentences are statutorily excessive.__

        4.  Did you receive an evidentiary hearing in your petition, application or motion?

            Yes ☐         No ☒

        5.  Result __Denied__

        6.  Date of result __December 12, 2005__

    (c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

        1.  First petition, etc.       Yes ☒       No ☐

        2.  Second petition, etc.   Yes ☒       No ☐  (appeal still underway)*

    (d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

        __* Re second petition: appeal filed but error in mailing notice of appeal necessitated filing Motion for Belated Appeal (non-tolling) and AEDPA deadline would have expired awaiting appellate court to rule.__

11.  (a)  3.  Grounds raised  I - It was fundamental error to include the optional jury instruction of "union" being an alternative to "penetration" in a case involving digital penetration and counsel was ineffective for not raising this, either during trial or in motion for new trial;

II - The jury instructions given for counts 3, 5, and 7 were fatally flawed in that they were not for the crimes for which the defendant was charged and convicted and counsel was ineffective for not raising this, either during trial or in motion for new trial;

III - Trial counsel was ineffective for not addressing the state's failure to meet the penetration standard required for a conviction of sexual battery by digital penetration;

IV - Counts 1 and 2 are duplicitous and deprived Mr. Frederick of his constitutional right to a unanimous jury verdict;

V - The state failed to prove the element of age on count 2, and counsel was ineffective for not raising this;

VI - The jury verdicts on counts 2 and 4 were inconsistent in that the acquittal on count 4 negates a necessary element for conviction on count 2. Additionally, counsel's failure to raise this constitutes ineffective assistance;

VII - Counsel was ineffective in his cross examination of proclaimed expert witness Judith Land and for not having a true medical expert witness testify for the defense;

VIII - Newly discovered evidence - main witness supporting victim has come forward to say the State told him to lie, and victim's maternal grandmother has provided additional information of prosecutorial misconduct;

IX - Newly discovered evidence of prosecutorial misconduct supports contention defendant was deprived of a fair trial;

X - Defense counsel was ineffective in failing to call witnesses specifically requested by defendant to impeach testimony of victim;

XI - The cumulative effect of the issues contained herein resulted in an unfair proceeding and prejudice to Mr. Frederick.

12  State *concisely* every ground on which you claim you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.

   Caution: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. As to all grounds in this petition, you may be barred from presenting additional grounds at a later date.

   For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted all your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

   Do not check any of the these grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a)  Conviction obtained by a plea of guilty which as unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequence of the plea.

(b)  Conviction obtained by use of a coerced confession.

(c)  Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)  Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)  Conviction obtained by violation of the privilege against self-incrimination.

(f)  Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)  Conviction obtained by the violation of the protection against double jeopardy.

(h)  Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i)  Denial of effective assistance of counsel.

(j)  Denial of right of appeal.

A.  Ground one: See attached pages 5a, 5b, 5c, et al.

Supporting FACTS (state *briefly* without citing cases or law):

B.  Ground two: See attached pages 5a, 5b, 5c, et al.

Supporting FACTS (state *briefly* without citing cases or law):

12.   A.   Ground one:

Petitioner was charged with sexual battery by digital penetration. The jury was instructed that "union is an alternative to penetration and means coming into contact."  This is contrary to Florida law and Florida courts hold that when this jury instruction is given in cases involving sexual battery by digital penetration, the error is fundamental.

Petitioner's sixth and fourteenth amendment rights were violated by use of the erroneous jury instruction because it exempted the government from having to prove every element of the offense and by counsel's ineffectiveness in failing to object. (See Memo of Law for additional details)

B.   Ground two:

Petitioner was charged in Counts 1 and 3 of committing acts described as sexual battery by digital penetration.  In Florida, the requisite proof of penetration in sexual battery cases is more stringent for digital penetration than it is for penile penetration.  In cases of digital penetration, proof only of a "union with" the vagina is insufficient to sustain a conviction of sexual battery.

The more stringent proof for penetration was neither mentioned nor proven during trial. Counsel was ineffective for not bringing this to the attention of the jury thus violating Petitioner's sixth and fourteenth amendment rights to effective assistance of counsel. (See Memo of Law for additional details)

C.   Ground three:

Florida Statute 794.011(1)(h) defines certain criminal behavior that is the second degree felony of lewd and lascivious act under 800.04(3) if the victim is 12 or over but under 16, but is the life felony of capital sexual battery under 794.011(2)(a) if the victim is under 12.

Petitioner was charged in Counts 1 and 2 with committing this criminal behavior, but the range of dates defined by the state in the Information included times when the victim was under 12 as well as the victim's 12th birthday, a time when she was "12 or over but under 16."

Because Counts 1 and 2 each charged two separate crimes, lewd and lascivious act under 800.04(3) when the victim was 12 and capital sexual battery under 794.011(2)(a) when the victim was under 12, each count was

duplicitous.  The duplicity in Counts 1 and 2 went uncorrected and a jury found Petitioner "guilty as charged in the Information" on each count. Counsel did not bring it to the attention of the court at any time.

Duplicity deprives a defendant of his right to have a unanimous jury decision. Petitioner's sixth and fourteenth amendment rights were violated in that he was deprived of his right to a unanimous jury decision and in that his counsel was ineffective. (See Memo of Law for additional details)

D.  Ground four:

Florida Statute 794.011(1)(h) defines certain criminal behavior that is the second degree felony of lewd and lascivious act under 800.04(3) if the victim is 12 or over but under 16, but is the life felony of capital sexual battery under 794.011(2)(a) if the victim is under 12.

Petitioner was charged in Counts 1 and 2 with committing this criminal behavior, but the range of dates defined by the state in the Information included times when the victim was under 12 as well as the victim's 12th birthday, a time when she was "12 or over but under 16." The jury returned a verdict of "guilty as charged in the information," without any further specificity towards indicating when during the range of dates defined by the state the offensive behavior occurred.

Because, according to this verdict, the victim could have been 12 or under 12, the jury decision fails to show conclusively that the victim was under the age of 12, as required for a conviction for capital sexual battery.

Petitioner's sixth and fourteenth amendment rights to have the jury prove each element of a crime were violated and his convictions are a nullity. (See Memo of Law for additional details)

E.  Ground five:

Florida Statute 794.011(1)(h) defines certain criminal behavior that is the second degree felony of lewd and lascivious act under 800.04(3) if the victim is 12 or over but under 16, but is the life felony of capital sexual battery under 794.011(2)(a) if the victim is under 12.

Petitioner was charged in Counts 1 and 2 with committing this criminal behavior, but the range of dates defined by the state in the Information included times when the victim was under 12 as well as the victim's

12th birthday, a time when she was "12 or over but under 16."

The jury returned a verdict of "guilty as charged in the information," without any further specificity towards indicating when during the range of dates defined by the state, the offensive behavior occurred, and therefore it was error for the sentencing court to choose the harsher offense over the more lenient offense for sentencing purposes.

Petitioner's sixth and fourteenth amendment due process rights to have the jury rule on each element of the crimes and be sentenced accordingly were violated. (See Memo of Law for additional details)

F.  Ground six:

Petitioner was charged in Counts 3, 5, and 7 of the Information with committing a Lewd Assault upon his victim, a child under the age of 16, in violation of Florida Statute 800.04.

Florida Statute 800.04 covers a number of separate and distinct offenses against children, including lewd assault, lewd act upon, and lewd act in the presence of - each having different elements of proof.

Lewd assault, in addition to the elements of a lewd act, includes three additional elements: 1) an intentional, unlawful threat by word or act to do violence to the person of another, 2) coupled with an apparent ability to do so, and 3) doing some act which creates a well-founded fear in the other person that such violence is imminent.

The jury instructions given for Counts 3, 5, and 7 (as well as Counts 4 and 6, which Petitioner was found not guilty of) were, "Before you can find the defendant guilty of Five Counts of Lewd Assault, the State must prove the following two elements beyond a reasonable doubt." Element 1 was, "M.F.[1] was under the age of 16," and the second element was that he had committed a different lewd act upon M.F. for each count. The three elements of Lewd Assault were not given, exempting the government from having to prove every element of the offenses of Lewd Assault alleged in Counts 3, 5, and 7 in the Information. Counsel made no objection.

Petitioner's sixth and fourteenth amendment rights to have the government prove every element of an offense were violated as were his rights to effective counsel. (See Memo of Law for additional details)

---

[1]  M.F. are the victim's initials.

G.   **Ground seven:**

Florida Statute 794.011(1)(h) defines certain criminal behavior that is the second degree felony of lewd and lascivious act under 800.04(3) if the victim is 12 or over but under 16, but is the life felony of capital sexual battery under 794.011(2)(a) if the victim is under 12.

Petitioner was charged in Count 1 with committing this criminal behavior, "on or between December 31, 1991 and September 27, 1995," in violation of 794.011(2)(a), and in Count 3 with committing the identical behavior, "on or between September 27, 1995 and May 31, 1997," in violation of 800.04(3).

The jury returned a verdict of "guilty as charged in the information," on both counts without any further specificity towards indicating when during the range of dates defined by the state, the offensive behavior occurred. Because both counts included the date September 27, 1995 within the range of dates defined by the state in the Information, it cannot be determined from the jury verdict that both Count 1 and Count 3 did not occur on September 27, 1995.

Applying the rule of lenity to this situation requires the resolution to be the most favorable to the Petitioner and that resolution would be that Counts 1 and 3 occurred on September 27, 1995 and are one and the same offense, which makes separate convictions and punishments a violation of Petitioner's Fifth Amendment Right against Double Jeopardy. (See Memo of Law for additional details)

H.   **Ground eight:**

Florida Statute 794.011(1)(h) defines certain criminal behavior that is the second degree felony of lewd and lascivious act under 800.04(3) if the victim is 12 or over but under 16, but is the life felony of capital sexual battery under 794.011(2)(a) if the victim is under 12.

Petitioner was charged in Count 2 with committing this criminal behavior, "on or between January 1, 1993 and September 27, 1995," in violation of 794.011(2)(a), and in Count 4 with committing the identical behavior, "on or between September 27, 1995 and May 31, 1997," in violation of 800.04(3). The jury returned a verdict of "guilty as charged in the information," on Count 2, but "not guilty" on Count 4.

Because both counts included the date September 27, 1995 within the range of dates defined by the state in the Information, it cannot be

determined from the jury verdict that Count 2 did not occur on September 27, 1995, and in fact, the rule of lenity requires the presumption that it did occur on this date as the victim would have been 12 on that date rather than under 12, a more favorable scenario for Petitioner. Because the jury's verdict of not guilty on Count 4 means they found he did not commit that particular behavior at any time during the range of dates specified in Count 4, which includes September 27, 1995, there is a conflict in the verdicts with the jury saying in Count 2 that certain behavior occurred on September 27, 1995 and in Count 4 that it did not.

The conflict between the jury's verdicts on Counts 2 and 4, must be resolved using the rule of lenity, resolving it in the way most favorable to the Petitioner, which would be acquitting Petitioner of Count 2 in accordance with his Fifth Amendment Right against Double Jeopardy. (See Memo of Law for additional details)

I.  **Ground nine:**

During Petitioner's trial, the state called as an expert witness, Ms. Land, the nurse from a safe house the victim went to. Ms. Land's credentials were that she had an associates degree in nursing from a Community College, and her experience was in patient care, not diagnostic medicine.

Her testimony was very prejudicial to Petitioner but everything prejudicial she testified to was incorrect. Petitioner's trial counsel had deposed her and knew what her testimony was going to be but did not arrange for there to be an expert witness for the defense, someone to counter her testimony.

Petitioner's current counsel has been in touch with Dr. Nathan B. Hirsch, MD, 7300 S. W. 62 Place, South Miami, Florida 33143-4806, who is Chairman of Obstetrics and Gynecology at South Miami Hospital, and has experience as an expert witness in his field, to have him testify on Petitioner's behalf at his evidentiary hearing. The trial court, however, chose not give Petitioner an evidentiary hearing on Petitioner's 3.850 motion so he never got to present to the court the facts his expert witness would testify to, facts which would entitle Petitioner to relief.

Dr. Hirsch has reviewed M.F.'s medical exam, and been briefed on the testimony Ms. Land provided during the trial and he feels so strongly that Petitioner has suffered an injustice that he is cutting his standard rate by 50%. Any credentials Ms. Land may have pale in comparison to

those of Dr. Hirsch as experts in this field go.  Dr. Hirsch is prepared to testify that contrary to Ms. Land's testimony, hymens do not heal themselves after being penetrated so that after 72 hours, penetration can no longer be determined.  He will testify that once a hymen is penetrated, a physical exam will be able to tell, particularly if the person being examined has a septated hymen, as the victim in this case did, a variation of the normal which is more prone to damage from penetration.

Dr. Hirsch will testify that Ms. Land's reference to women being pregnant with their hymens still intact is not a result of penetration followed by healing/regeneration of the hymen, but of the sperm being deposited outside the hymen and working its way through the natural small openings so that the hymen was in fact never penetrated when the egg was fertilized.

And Dr. Hirsch will testify that contrary to Ms. Land's statement that the results of M.F.'s exam neither confirm nor deny penetration of the vagina, the exam actually confirms that M.F. was never penetrated, particularly hundreds of times as M.F. testified to at trial.

Petitioner has been denied his *sixth* and *fourteenth* amendment rights to confrontation, to present witnesses on his behalf, and to effective assistance of counsel. (See Memo of Law for additional details)

J.  Ground ten:

Consistent with its theory of defense, Petitioner intended to impeach the victim to bring to the jury's attention the many contradictions existent in her journey from announced victim to key witness at trial.  Petitioner, however, was prevented from impeaching the victim with evidence that she had misled people on related fanciful claims, and lied about things her brother had done. Since M.F. was the sole witness to the charges, her impeachment was critical to Petitioner's defense.

During cross examination, the victim denied telling a boy her brother was a professional skateboarder and had gone to Russia, though she admitted speaking with him. When her brother testified, he denied he had gone to Russia as a professional skateboarder and defense sought to introduce the testimony of the boy that the victim had told that her brother was a champion or professional skateboarder who had gone on a tour of Europe and Russia.  The state objected and the court sustained the objection, saying, "Interesting issue for appeal. Objection sustained." (T: 1939-40,

48)

The defense also sought to introduce testimony that the victim was prone to exaggeration, especially when discussing her boyfriends. Lori Moore, 19, testified as a state witness on direct that she and victim had been friends, and the victim told her that Petitioner sexually molested her. (T: 1289) On cross, the defense asked if the victim was prone to exaggeration, the state objected and the court sustained the objection. (T: 1299)

On the proffer, the witness said the victim wouldn't say things more extreme than they were, but in her deposition, she had testified that M.F. would say things to the extreme, especially about boyfriends. The court's suppression of this impeachment evidence directly addressing the victim's truthfulness, violated Petitioner's sixth and fourteenth amendment rights of confrontation and to present evidence. (See Memo of Law for additional details)

## K.  Ground eleven:

After M.F., the victim in this case, made accusations to the police alleging that the Petitioner had sexually molested her numerous times, she told a number of people that the accusations were not true.  She also wrote a letter of recantation, but under pressure from prosecuting attorney, Marybel Johnson, recanted her recantation.

A victim's credibility is always an issue at trial, but in this case, M.F.'s credibility was more vulnerable than most due to her constantly changing story and reputation for being a chronic liar.  It was Petitioner's intended defense to impress upon the jury as strongly as possible the discrepancies in M.F.'s story in order to overcome the presumption of guilt that exists in cases of this nature.  To that end he had specifically requested of his counsel that Miriam Frederick, Velda Frederick, and Joe Jurbin, testify as witnesses for the defense.  Each could testify to statements being made by M.F. that they knew were not factual.  Their names were on the list of defense witnesses and each of them had been deposed.

Thus both Petitioner and his counsel knew what testimony they could provide.  On September 19, 1999, just before trial was to start, Petitioner wrote a letter to his counsel again informing him that he specifically wanted these three witnesses to testify. During the trial, unbe-

knownst to Petitioner, his counsel told each of these witnesses after the jury had viewed the videotaped testimony of Angel Allen, that their testimony wouldn't be needed.

Petitioner's sixth and fourteenth rights to effective assistance of counsel were violated by trial counsel's failure to call the witnesses specified by Petitioner. (See Memo of Law for additional details)

L.  Ground twelve:

There was no physical evidence to support the state's case so the state's prosecution relied primarily on prior consistent statements of the victim to bolster her story due to her presenting so many different stories. While much of the testimony was admissible under various theories, but there is one area where the state improperly introduced consistent statements from the victim's deposition to bolster her testimony, statements which occurred well after the events which were the subject of accusations of recent fabrication and/or improper motive.

Because the victim's testimony was the central evidence resulting in Petitioner's conviction, introduction of the buttressing testimony requires reversal. The defense impeachment of M.F. focused on the recantation letter; her related statements and the influence of older women who told her of sexual abuse they had encountered (T: 1166-97); her bias against Petitioner for strict rules (T: 1058-59); his stepfather status; and inconsistent statements M.F. made to the detective in her original statement (T: 1004-1017).

These inconsistent statements primarily related to the vast discrepancy in the number of times M.F. had said Petitioner sexually molested her, the extent of the sexual incidents, the dates of the occurrences, and when it ceased.

She was impeached on her deposition only as to her testimony that all that happened at bath time was Petitioner looked at her (T: 1023-25), and whether she knew the phrase "fingered me" and "ate me out" before or had gotten it from the detective (T: 1097-1099, 1102, 1252-1253). However, on redirect, and over defense objection, the state rehabilitated M.F. with later statements she made at her April, 1999 deposition, which were consistent with her trial testimony.

On redirect examination, the prosecutor asked M.F. about questioning by defense counsel at the deposition, and over objection (T: 1223-1227),

M.F. was permitted to testify that she had told defense counsel at the 1999 deposition, consistent with her trial testimony, that "this is what would happen two, three, four times a week." (T: 1228)

Referring to questions from defense counsel about when she told her mother, M.F. was permitted to answer that it occurred "about fourth or fifth grade would be 93-94, same thing I said earlier." (T: 1229)   The prosecutor invited the witness to point out that at deposition she responded consistently with her testimony at trial as to when she reported the incident to her mother (T: 1229-30).   Reviewing M.F.'s prior testimony about her conversation with Jenine Ufkin, the prosecutor also elicited testimony from her deposition that she had told defense counsel why she was afraid to report the abuse (because her father would get out of jail and she was afraid what he would do to her).   She also testified about her deposition answers to defense counsel relating to her conversation with Kenny Ufkin (T: 1231-32), though questioning on that issue, too, had focused on her inconsistent statement to the detective (T: 1068-71).

The prosecutor then had her repeat testimony about her conversation with Jamie Wilson (T: 1232-33).   While these topics had been broached on cross, there was no use there of M.F.'s deposition to impeach her on these issues.   Petitioner's fifth, sixth, and fourteenth amendment rights to due process, and confrontation were violated by the trial court improperly allowing prior consistent statements by the victim, thereby unlawfully bolstering her testimony. (See Memo of Law for additional details)

M.   Ground thirteen:

Through a series of witnesses the state introduced, through hearsay, damaging "testimony" of Velda Frederick (Petitioner's wife), and the mother of the victim.   The admission of the hearsay requires reversal. Though Petitioner's wife did not testify at trial, other state witnesses attested to the following for her: M.F. testified, discussing the day in May of 1997 when her mother caught her making out with a boy, that she spoke with Petitioner, then her mom came home and asked her if she still believed all she told her that had happened before, and she said she did.

Over hearsay objection, M.F. continued to testify that her mom asked her "if it still happened - or if I thought what had happened before,

what he did to me, and I said I knew it did." (T: 774) The implication
was that M.F.'s mom was referring to sexual things M.F. had told her
Petitioner had done to her years before. She testified that her mom said
ok, then left the room and Petitioner came in later and apologized to
them both and asked for forgiveness, saying if she didn't forgive him,
her mom would leave him. (T: 775) M.F. testified when she was in the
fourth or fifth grade, she told her mother that Petitioner had sexually
abused her (T: 821), that her mom asked a lot of questions, then called
Petitioner in when he came home. M.F. Testified that the two talked
while M.F. stayed in her room, then her mom came back in and over hearsay
objection, M.F. was permitted to testify that because of whatever Peti-
tioner had told her, her mother asked M.F. if she wanted her to leave
Petitioner. (T: 825-26) M.F. testified that she told her mother that it
was her decision. She said her mom had seemed very supportive and she
thought she was going to pack up and leave, but she did not. (T: 835)

   M.F. testified that after she went to Safe Harbor, her relationship
with her mom was not good. She expected her mom to take her side and
leave Petitioner. However, after she left Safe Harbor, her mom said
that's it, she was no longer going to put her daughter through this, and
would pack up Petitioner's stuff. Defense counsel's hearsay objection was
overruled.

   M.F. continued to testify about her concern that her mom was staying
with Petitioner, and that her mom told her she was still tied to Peti-
tioner Biblically, and they were allowed to be together.  M.F. testified
that her mom said it was her decision and her life. (T: 865-67)

   M.F.'s brother, Edward Frederick III,[2] likewise testified to hearsay
from Petitioner's wife, over defense objection. He told the jury his
sister called before going to Home Safe and he encouraged her.  Edward
testified when he went home, Petitioner said M.F. had called and was at
"Safe Place."  He looked pale and wide-eyed.  Over objection and after
proffer (T: 1538-52), Edward was permitted to testify that after he
walked in the door, Petitioner said he was just at Safe Harbor and M.F.
was there.  His mom asked if he knew about this, and Edward said yes.
She asked why he let her do it and the Edward said it was the right

---

[2]  This witness would later admit that the prosecutor instructed him
to lie and say anything that would support his sister, and many of
the things he said in the stand were not true.

thing. She yelled at him and he ran out the door and down the street, yelling that Petitioner was sick and similar things. Over renewed objection, the witness then said his mom told Petitioner that if she found out he did anything more, she was leaving him, saying that over and over. (T: 1564-65)  The witness also testified over hearsay objection, that his mom told him they had taken his truck afterward, while he was at school, in a lengthy story about coming out in the rain and his truck being gone. (T: 1579-1585)

The court overruled the defense hearsay objection (T: 1375), to the detective's comment that in the course of taking Petitioner's statement, Petitioner had told his wife he had crawled in bed with the victim and fondled her breasts. (T: 1812)

Petitioner's sixth and fourteenth amendment rights of confrontation were violated by the trial court admitting hearsay statements of Petitioner's wife. (See Memo of Law for additional details)

N.  Ground fourteen:

M.F., the victim in this case, alleged her stepfather, Petitioner, molested her multiple times over a six year period that began when she was eight years old.  Her brother Eddie, with whom she shared a bedroom for a while (T: 1595), is two years older than she (T: 915), was her best friend during this time (T: 914), as well as the time of the trial (T: 915), and she confided in him (T: 915).

When M.F. was being questioned by Detective Olson, and he mentioned he wanted to talk to her brother, Eddie, she became extremely apprehensive.  It was as though she was afraid that Detective Olson would question Eddie before she had a chance to talk to him and tell him what to say.  Such is evidenced by the following from the deposition of M.F. taken by Detective Olson on September, 1999. (See Exhibit D of the 3.850, pages 7-10)

Olsen – "You know what? I need to speak to him."

M.F. – "Eddie? - I don't know if he's going to answer or not."

Olsen – "Because I really need to talk to him."

M.F. – "Why do you need to talk to him?"

   (Interruption)

M.F. – "Okay.  Why do you need Eddie's number?"

Olsen – "I want to talk to Eddie."

M.F. – "About?"

Olsen – "You don't want me to talk to him?"

M.F. – "No, I mean, I don't care if he's going to be like what, you know.  That's the way he is."

Olsen – "Do you want me to talk to Eddie?"

M.F. – "I mean, why would..."

Olsen – "Basically, I just want to know what's been going on, how he's taking it.  I want to make sure he's doing okay."

M.F. – "He's flipping out."

Olsen – "He's flipping out?  Well, see, that's a concern of mine, okay?"

M.F. – "Because he is like, give me a gun.  That's how he feels right now because I am like the only one, I mean, he doesn't even protect his girlfriend.  He's like you're my little sister..."

Olsen – "That's good that you have a relationship with your brother like that, first of all."

M.F. – "Right.  He's like you are my little sister, and he's like whatever you want me to do, and I told him to get a gun and kill him, but I mean, it was like -- that was my reaction, and he said, you know, I don't even know what to do but I'm not going to sit there under his roof and have him tell me what to do.  So he packed his stuff and just left."

M.F. is clearly very close to her brother Eddie, and he would do any-thing for her, but she obviously does not want Detective Olsen talking to him before she has the opportunity to.

Eddie testified for the State during the trial, saying he was the only one supporting his sister (T: 1616).  He testified that he never witnessed any incident of M.F being molested,[3] but his testimony sup-porting her was critical to the State's case in that it bolstered M.F.'s credibility, something that was badly eroded by her having told so many that she was lying about the charges against her dad.  M.F. had also

---

[3]  M.F. testified that her dad would sneak from his room to her room at night – "five to six times a week" – for over five years, to molest her (over 1400 times).  No one else in the household – her mother and two brothers – ever noticed this going on.  Two years after this started, her little brother was born and had health pro-blems, but even with the constant and unpredictable awakenings of the household caused by a sickly newborn, not a single person in the household ever noticed Petitioner missing from his bed, or caught him sneaking about, doing the alleged molestations.

testified that she had, in fact, lied under oath (T: 1160), as well as having lied to three attorneys (T: 1164/5).

After the trial, the prosecutor, Marybel Johnson,[4] left the State Attorney's Office, and went into private practice, with M.F. as her client in a number of civil lawsuits (in amounts as much as $5,000,000), against members of M.F.'s family.[5]  (See Exhibit E of the 3.850)[6]

As the lawsuits got underway, M.F. approached her brother, Eddie, offering him some of the money she was going to get if he would support her story in the civil cases, like he did in the criminal case.  She told him *she was making similar offers to others whose testimony she needed.*

Eddie felt he had been used.  He had believed the wrong side.  He went to his mother and told her that the prosecutor in the case, Marybel Johnson, had instructed him on how to testify, and how he needed to support whatever his sister might say happened.  He did not hesitate when asked to provide a sworn affidavit to that effect. (Exhibit G of the 3.850)

In his affidavit, Eddie states, "During all this, when everyone abandoned my sister, I was the only one who stood by her. I can't do that anymore," and he admits that a number of things he testified to at trial as things he had firsthand knowledge of, he actually didn't, but was only supporting what his sister was claiming happened.  For example, he testified that he heard his mom tell his dad (Petitioner), "If I find out you did anything more, I'm leaving you," but he now admits he never heard

---

[4]  Marybel Johnson, in some documents included in the Appendix [to the 3.850], will be seen as Marybel Reinoso, but listing no Florida Bar Number.  She is listed with the Florida Bar under the name Marybel Coleman even though she practices law under the name Marybel Reinoso.

[5]  Petitioner's mother has a homeowner's policy with State Farm, which covers this sort of lawsuit, and State Farm is aggressively fighting back.

[6]  As the amended version of the 3.850 was being finalized, a new development in the civil case developed whereby M.F. was facing dismissal of the lawsuit against her mother because if she in fact told her mother of the molestation in 1994-95 as she claims, the statute of limitations had passed.  When confronted about this by the attorney representing M.F.'s mother, Marybel Johnson (Reinoso/ Coleman) responded by saying M.F. now says she told her mother in 1996.  This new date is contradictory to all the testimony presented during the criminal trial proceedings.

anything like that and only said he did because it supported his sister, according to prosecutor Johnson's instructions.

Another example he mentions in his affidavit concerns when, during his testimony, he was asked about the time his sister told him over the phone that she was going to recant the things she said her dad had done to her. He was asked if she had, in fact, told him during that phone conversation that the recantation[7] was the real truth. His answer to this question was critical to both the state and to Petitioner's defense. If he testified that she never said that, it would support his sister since it was the state's contention that M.F.'s recantation letter was not the truth, and the real truth was that all the abuse really did happen. If he testified that M.F. confided to him that the recantation letter was, in fact, the real truth and that the allegations against Petitioner were indeed false, this would have been very favorable towards Petitioner's efforts to prove his innocence, but such would not support his sister, as he was instructed to do by Ms. Johnson. He had to make his decision when he was asked, "And what she told you, Edward, was the statement that she swore out in Fort Meyers[8] was the real truth, correct?" and Eddie responded, "She never told me" (T: 1605), supporting his sister with a statement that he now admits was a lie. His sister had, in fact, confided to him that the allegations against her dad were false and the recantation letter was the real truth. This was very damaging to Petitioner and very beneficial to Ms. Johnson and the State.

Eddie observes in his affidavit, "one would think it would take a lot of therapy to deal with the things my sister says happened but she went to therapy only once and didn't go back." (Exhibit G of the 3.850)  The significance of this driven home because the trial judge, too, believed M.F. had been through so much that she would need a lot of therapy, as evidenced by his comment during sentencing that it's going to take "probably a lot of therapy" to deal with it (T: 2250).

The real story concerning M.F. and the therapy comes from a sworn af-

---

[7]   M.F. wrote a letter of recantation saying the allegations against her dad were not true and in that letter she explained in detail how and why she came to make such allegations. (See Exhibit F of the 3.850)

[8] M.F. was staying with friends on Florida's west coast when she wrote out her recantation letter.

fidavit recently obtained from M.F.'s maternal grandmother, Tommie Kel-
ler. (See Exhibit H of the 3.850)  In her affidavit, Ms. Keller says M.F.
refused therapy, telling her, "Marybell said I didn't have to go so I am
not going."  If Ms. Johnson truly believed M.F.'s allegations of moles-
tation, wouldn't she have encouraged M.F. to get into counseling.  Is
there any scenario where she would not?  Even if Ms. Johnson was uncer-
tain as to M.F.'s truthfulness about the allegations, would not counsel-
ing be the best route towards getting M.F. to either come to grips with
her problems in socially acceptable ways and admit that she was lying
about what her dad had done.  There is no scenario existent that would
justify Ms. Johnson telling M.F. she didn't have to go to counseling, and
all scenarios that are legitimate would have Ms. Johnson using the obvi-
ous influence she had over M.F. to get her to go to counseling.

If M.F. confided to Ms. Johnson that the allegations of molestations
were false, or if Ms. Johnson was otherwise convinced they were false,
then M.F. would benefit from counseling, not to address being molested,
but to address her need to lie about such things.  If M.F. were telling
the truth about the molestation, then she would benefit from counseling
in coming to terms with what had happened to her.  Thus, regardless of
whether M.F. was lying or being truthful, she needed counseling.  The
only scenario where someone would not want her to go to counseling is
that she was lying and that person did not want that coming to light.
Was this why Ms. Johnson told her not to go to counseling?

The fact that M.F. has not gone to counseling is not disputed, nor is
the fact that M.F. feels very close to Ms. Johnson, a person who has
tremendous control over her.  Ms. Keller's affidavit has that M.F. said
to her, "Marybell said I didn't have to go so I am not going," and the
fact that M.F. is not going to counseling raises a flag of suspicion an-
nouncing that something very wrong is going on with Ms. Johnson and her
relationship with M.F.

Another statement in Ms. Keller's affidavit adds to the mystery of
what was going on between Ms. Johnson and M.F.  Ms. Keller tells about
M.F. living with her during trial preparations, and how M.F. treated her
like . . .

"her sweet loving Grandma.  But every time I would drive her to
Mary Bell's [sic] office, there would be a complete change in her
attitude.  Mary Bell would be the only friend she had.  [M.F.]

would say, 'Mary Bell loves me and she wants me to live with her,
as a close friend, and I love her.  I would do anything I could
for her, but it would be a conflict of interest of our trial.  She
is all I have beside my brother.'"

This raises more flags because it brings to light even more, the in-
fluence Ms. Johnson was having on M.F., an influence that was unethical
to nurture.  The attachment M.F. formed with Ms. Johnson, and her admis-
sion that she was willing to do anything she could for Ms. Johnson, sheds
light on why M.F., while hundreds of miles away from Ms. Johnson, put to-
gether a long and detailed recantation letter (Exhibit F of the 3.850),
told a number of people, including several attorneys, that this recanta-
tion was the actual truth, then returned from her trip, met with Ms.
Johnson and immediately recanted her recantation letter.

Prior to the meeting, M.F.'s own attorney, Scott Suskauer, a person
with absolutely no agenda in the case, someone whose only interest was in
the welfare of M.F., questioned her intensely as to the validity of the
recantation letter, and M.F. did not waver from her stand that the recan-
tation was the truth and the allegations against her dad were the lie.  A
few minutes with Ms. Johnson, however, and M.F. changes her story once
more.

From the time M.F. first made allegations against her dad, literally
dozens of people urged her to tell the truth, her mother, her maternal
and paternal grandmothers, her brother, her Church pastors, and with all
these people, such urging resulted in first one story and then another,
and nothing changes quickly.  But there is one person in the world who is
an exception to this routine and that is Ms. Johnson.  There is not a
single time when M.F. was proclaiming that her dad had done these things
and she met with Ms. Johnson and immediately afterwards, changed her
story to her dad not doing the things.  And there is not a single time
when M.F. was proclaiming that her dad had NOT done these things and she
met with Ms. Johnson and DIDN'T immediately change her story to her dad
doing the things.  What does Ms. Johnson tell M.F. in these meetings that
causes M.F. to always embrace again the allegations that Ms. Johnson, as
the prosecutor in the case, needs to prove at the trial.  Is she urging
M.F. to just be truthful and tell what happened?  We know she not only
did not tell Eddie that, she told him to do something that is directly

contradictory to that.  For her to have told Eddie what she did, it would not make any sense that she would then have told M.F. to tell the truth.

To what lengths will Ms. Johnson go to win in court?  Further statements contained in Ms. Keller's affidavit, combined with incidents documented in the trial transcripts, offer insight in that area. Ms. Keller, in her affidavit, describes how when she and M.F. would go to Ms. Johnson's office, as soon as Marybel would come out to get M.F., she would "put her arms around M.F. and kiss her on the cheek or forehead and play with her hair." Ms. Keller tells how much that bothered her.

Ms. Keller says it also bothered her when, on the days that they would go to Ms. Johnson's office, M.F. would wear lots of makeup, and wear low cut blouses and tight pants.[9]  Ms. Johnson knew very well how involved M.F. was in activities of their Church, as were all the members of M.F.'s family, both immediate and extended, and how seriously they all took the teachings of the Bible.  She also knew that M.F. had rebelled against her dad because he would not let her wear such clothing, and that this rebellion could have been – and more than likely was – the motivation behind her making the allegations she had against her dad.

But Ms. Johnson encouraged M.F. to do these very things her parents and other family members did not approve of and would not allow.  Ms. Johnson's condoning, perhaps even encouraging, the very behavior that M.F.'s family prohibits, combined with hugging and kissing M.F., and playing with her hair, is the classic grooming behavior of an ephebophile.[10]  M.F. had been rejected by just about everyone, due to her on again, off again, allegations, and she ate up this attention from Ms. Johnson, becoming putty in her hands.  The success of this grooming behavior by Ms. Johnson is evidenced by M.F.'s statements to her grandmother of the love that she and Ms. Johnson shared and how she would "do anything for Marybel."

_____

[9] It should be kept in mind that M.F., and the members of her family, take their religious teachings very seriously, and outward displays of one's sexuality are considered highly improper.  When a child does this when visiting an adult, it is extremely disturbing, and when that adult is of the same sex, it is even more disturbing, particularly when that same sex adult is hugging and kissing the child and playing with her hair, and when such occurs in a family as religious as M.F.'s, it is more disturbing yet.

[10] a pedophile who targets teenagers.

The validity of this information is supported by Mr. Norman's testimony that Ms. Johnson had told M.F. she'd like to adopt her. (T: 1707)

M.F. testified at trial that a friend told her how bringing charges against her dad would make it where she could wear what she wanted, and hang around with who she wanted. Ms. Johnson's behavior would feed such a devious plot rather than expose it. Ms. Keller's statement in her affidavit as to what transpired on the days when she would take M.F. to meet with Ms. Johnson is highly relevant and indicative of serious prosecutorial misconduct that deprived Petitioner of a fair trial.

Ms. Keller goes on to tell how on trial day, Ms. Johnson instructed M.F. to "dress like an eight year old," to wear "little makeup," and that "she would braid her hair." Ms. Johnson also gave "gave her a Teddy Bear to hold, [which] someone took away." This description of events is supported in the trial transcripts where Petitioner's counsel objects, "I ask that the witness not be permitted to have a Teddy Bear when she is up there testifying. That is only to curry favor and sympathy," whereupon M.F. interrupted with, "Can I hide it?" Defense counsel continues, "Excuse me,[!] whether they can see it now or not, I think what that does is that [it] is there to ingratiate the witness with the jury. There is absolutely no need for the witness to have a stuffed animal while she is testifying."

M.F., snaps back, "That's fine. It's not a big deal." (T: 815) The Court comments, "If the witness kind of needs it, fine," indicating that the judge believed this Teddy Bear from Ms. Johnson just before entering the courtroom was actually something M.F. brought from home and needed for comfort during a difficult testimony. This it was not. Ms. Johnson had given it to her when she arrived at the courthouse. M.F. testified, "It was a birthday present. I just got it."

The judge's comment is very significant. It drives home the fact that this Teddy Bear that effected the judge, would have also have effected the jury also, giving the State an unfair advantage. The jury did not get to see the Teddy Bear, so the harm done was limited to how its effect on the judge.

Ms. Johnson, however, did get away with swaying the judge and jury through her orchestration of M.F.'s attire and personal appearance for the trial, disguising this 16 year old who likes to dress in sexy ways for her meetings with Ms. Johnson, so that she looked like a little girl,

creating a false image - false evidence, if you will - and ingratiating the witness with the judge and jury.[11]

Such prosecutorial misconduct, specifically aimed at swaying the jury, is no different than had Ms. Johnson told M.F. to testify that she has been so traumatized that she walks around in public, clutching a Teddy Bear.  The end effect would be the same, misleading the jury into thinking something false is fact.  The actions on Ms. Johnson's part were done deliberately, with the sole purpose of disadvantaging  and prejudicing the Petitioner.

Although the jury did not see the Teddy Bear, it did see M.F. dressed like a little girl, her hair braided in juvenile twin pony tails.  Ms. Johnson's purpose in doing this was, just like with the Teddy Bear, to mislead the jury to her advantage and to the disadvantage of Petitioner. Ms. Johnson made certain M.F. wasn't dressed like she normally dressed, and especially not like she dressed when she would meet with Ms. Johnson.

The jury was made aware that they must make their own decision as to whether witnesses were telling the truth or not - the court instructed them on this - and so the jury was prepared mentally to fulfill their duty there.  But they were not prepared for a situation where the prosecutor would dress the victim up to be something she was not.  This is not something that would cross a juror's mind.  Most jurors believe our judicial system functions on a basis of fairness, with the defendants being the "bad guys" and the representatives of the State, the "good guys." Ms. Johnson pulled the wool over the jurors' eyes.

Such is patently improper.  If this had been an accident case and the victim's attorney arranged to have the victim come into the courtroom wearing a fake cast and neck brace, such behavior would invalidate any verdict favorable to the victim.  There is no difference between a prosecutor dressing up an accident victim to fool the jury and Ms. Johnson doing that same thing with M.F. to fool the jury. Ms. Keller's affidavit reveals the lengths Ms. Johnson went to in presenting false evidence to the jury and such prosecutorial misconduct violates the rudimentary demands of justice.

---

[11]  When Ms. Johnson saw M.F. arrived at the courthouse wearing a skirt split up the side for the trial, she took her off and put her into pants and a different top so that she would look much younger, and Ms. Johnson personally braided M.F.'s hair into twin ponytails, a hairstyle almost exclusively worn by young girls.

Ms. Keller concludes her affidavit with, "[Ms. Johnson changed M.F.] from a child who loves her family to a child who hates the world."

Norman Walker, who testified at the trial, was interviewed three weeks after the trial by an investigator for the defense seeking more information on the dynamics of this case.  Mr. Walker's entire statement was included as Exhibit I of the 3.850 because it offers insight into so many of the things other witnesses have testified to.  Mr. Walker is a minister who spent six years doing prison ministries, and says he has spent time around child molesters, murderers, etc., but M.F. "takes the cake when it comes to story telling." (Exhibit I of the 3.850, at page 20)

M.F. bragged to Mr. Walker how she had talked to Marybel and she was going to have her mother and grandmother arrested and she laughed over that. (Exhibit I of the 3.850, at page 23)  He also says M.F. told him Marybel called her all the time to see if there was anything she could do for her (Id.), and that Marybel told her that she wanted to adopt her and really loved her. (Id. at page 24)  This supports the statements made Ms. Keller.

Mr. Walker said considering how much time M.F. spent staying with him and his family, he was surprised the lawyers only talked with him for about five minutes. (Id. at page 26)

The information contained in Ms. Keller's affidavit, as well as that contained in the affidavit of M.F.'s brother, Eddie (Edward Frederick III), was not known to the defense at the time of the trial.  Had the defense known these things at the time of the trial, and addressed it before the judge and jury, the outcome of the trial would have been significantly different, and more favorable to Petitioner.

Ms. Johnson had no way of knowing whether M.F. was being truthful about the allegations against her dad or not, but as an officer of the court, and a member of the Florida Bar, she had an obligation to be a seeker of truth, and present the facts fairly to the jury, without deliberate distortion designed to give her side an unfair advantage.  To say Ms. Johnson failed in this obligation would be a gross understatement.

Certainly, if M.F.'s brother, Eddie, indicated to Ms. Johnson that he was nervous about testifying at trial, she should have told him to just be truthful, testify to those things he knew about firsthand, nothing more, nothing less, and if questioned about something he knew nothing

about – or didn't remember – just say so.  But Ms. Johnson did not do that.  Ms. Johnson did not want to risk having him get up on the stand and say things that didn't support M.F.  Reasonably, such would be the difference between a win and a loss for her side.

She needed a witness who would support M.F. unconditionally and Eddie was perfect for this.  He was the one person who had stood by M.F. throughout all this, never asking questions, never making waves.  So instead of simply telling Eddie in front of others, particularly in front of  M.F., to testify to the truth, Ms. Johnson called him into her private office, closed the door and instructed him to perjure himself by "support[ing] whatever your sister says happened."  If during the trial, he were to be asked about whether M.F. confided to him during that phone call that the recantation letter was the truth and the allegations were the lie, would he be "supporting whatever your sister says happened" if he told the jury what really happened?  He would not.  M.F.'s story, at the time of the trial, was that the molestation did happen, and how does he support that version of her story?  He lies.  He perjures himself.  He does what Ms. Johnson instructed him to do.  And now he admits that he lied.

Both the false testimony Eddie gave and the false evidence presented to the jury through M.F.'s costumed appearance, supported matters material to the State's case against Petitioner, and Petitioner's counsel was unaware that this deception was going on and he thus did not defend Petitioner against it during trial.

Ms. Johnson was the driving force behind these things and it cannot be argued that these things didn't mislead and sway the jury to the prejudice of Petitioner.  Even the seasoned judge was swayed by Ms. Johnson's false evidence concerning the Teddy Bear M.F. clutched, and if the Teddy Bear swayed him, more than likely, so also did the little girl clothing and the little girl braided pigtails.

Petitioner's sixth and fourteenth amendment rights to due process were violated by the trial court's failure to hold an evidentiary hearing to review the new facts Petitioner alleges in his newly discovered evidence that indicated state witnesses had perjured themselves and the prosecutor knew about it. (See Memo of Law for additional details)

O.  **Ground fifteen:**

During the trial, one of the issues testified to was when victim M.F. first informed her mother that she was being sexually abused by Petitioner.  This date was testified to more than a dozen times.  M.F. testified that it was 1) "around the fourth or fifth grade" (9/93 to 5/95) (T: 822); 2) it was right after her friend Lori moved in across the street (T: 822) (Lori testified she moved in during the summer of 1993 (T: 1284)); 3) it was around the third of fourth grade, maybe the fifth (T: 912); 4) she told her mom around May of 1995 (T: 933); 5) it was between two to three years after it started (which was at beginning of 2nd grade (9/1991)) (T: 936); 6) it was 5th grade (T: 948); 7) all of a sudden her mother brought it up and she had told her three years earlier (T: 978) (the situation where her mother "suddenly brought it up" occurred in May of 1997 (T: 965, 980)); 8) she told her mom in 1995 (T: 1011); 9) she told Lori in '93 or '94 (T: 1020); 10) she only told her mother only that one time (T: 1021); 11) the first time she told her mother was "somewhere between '92 and '95" (T: 1208); 12) "I would guesstimate like '93" (T: 1208); 13) it was in the 4th or 5th grade (T: 1209); 14) it was in '93 or '94 when she first told her mother (T: 1211).

Marybel Johnson, (now using the name Marybel Reinoso and Marybel Reinoso Coleman - she is registered with the Florida Bar as Marybel Reinoso Coleman), was the prosecuting attorney in this case, but left the State Attorney's Office after the trial, and went into private practice, where she proceeded to represent the victim in this case, M.F., in a number of civil lawsuits based on the allegations of this case.

In a civil lawsuit filed against Velda Frederick on behalf of M.F. by Marybel Johnson, the date that M.F. told her mother (Velda Frederick) is again raised, and given as "Sometime in 1995" when M.F. "was between eleven and twelve years old." (Exhibit J of the 3.850)  The attorney representing Velda Frederick filed a Motion to Dismiss, pointing out that the 7-year statute of limitations had expired, because even if December 31, 1995 is assumed as the date, the civil suit would have to be filed by December 31, 2002.  Since the suit was filed on January 13, 2003, M.F. missed the statute of limitations. (Exhibit K of the 3.850)

Marybel Johnson filed an Amended Complaint changing the date that M.F. told her mother to "Around May, 1996" when M.F. "was between twelve and thirteen years old." (Exhibit L of the 3.850)

Velda Frederick's attorney filed an Answer stating, "[M.F.'s] com-

plaint should be dismissed because [M.F.] has perpetrated a fraud upon
the court by changing the allegations of the complaint to avoid the sta-
tute of limitations."

It is blatantly obvious what Ms. Johnson is doing.  This is clearly
not something M.F. would have known to do since she would not know about
statute of limitations, but is something Ms. Johnson has done to manipu-
late the court to obtain a win regardless of the ethics or legality.
M.F. is clearly going along with this since she will have to testify to
these dates, now different from what she testified to at the criminal
trial.

Petitioner contends this newly discovered evidence supports the pat-
tern of prosecutorial misconduct on the part of Ms. Johnson described in
the previous Ground (Ground XIV), including but not limited to: Ms. John-
son's showing M.F. improper attentions to gain the ability to manipulate
her, (stroking her, kissing her, telling her she loved her and wanted to
adopt her); having M.F. change her clothes after she arrived for the
trial so that she would look much younger to the judge and jury; braiding
her hair to make her look much younger to the judge and jury; giving her
a Teddy Bear to clutch during testimony to influence the judge and jury;
telling M.F. that she didn't have to go to counseling; and telling M.F.'s
brother to perjure himself on the stand.  There can be no question that
Ms. Johnson's actions deprived Petitioner of his Constitutional rights to
a fair trial.

Petitioner's sixth and fourteenth amendment rights to due process
were violated by the trial court's failure to hold an evidentiary hearing
to review the new facts alleged under newly discovered evidence that in-
dicated state witnesses had perjured themselves and the prosecutor knew
about it. (See Memo of Law for additional details)

P.  Ground sixteen:

Critical to a determination of the fairness of Petitioner's trial,
and any prejudice he may have suffered, is the cumulative effect of the
issues raised herein and Petitioner contends that even if the Court de-
cides one or more of the issues, taken alone, do not sufficiently preju-
dice Petitioner to warrant relief, the sum total of the errors combined
defines sufficient prejudice to warrant relief. (See Memo of Law for ad-
ditional details)

C.   Ground three:  See attached pages 5a, 5b, 5c, et al.

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

D.   Ground four:  and other grounds - See attached pages 5a, 5b, 5c, et al.

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

13.   If any of the grounds listed in 12A, B, C, and D that were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

_____

_____

_____

_____

14.   Do you have any petition or appeal now pending in any court, either state or federal, as to the judgement under attack?

Yes  ☒        No  ☐     (State appeal in 4ᵗʰ DCA re: denial of 3.800(a) motion)

15    Give the name and address, if known, of each attorney who represented you in the following stages of judgement attacked herein:

(a)   At preliminary hearing  Scott N. Richardson of Atterbury, Goldberger and Richard-
son, P.A., 250 Australian Ave., Suite 1400, West Palm Beach, Florida
33401, and Michael Salnick, The Law Offices of Michael Salnick, P.A., 250
Australian Ave., Suite 1203, West Palm Beach, Florida 33401

(b)   At arraignment and plea   same as above

(c)   At trial              same as above

(d) At sentencing ___Original sentencing: same as above_____

_____Resentencing: same as below_____

(e) On appeal __Richard L. Jorandby, Public Defender, 15th Judicial Circuit,__
__Steven H. Malone and Nan Ellen Foley, Assistant Public Defenders, 421__
__Third St., West Palm Beach, Florida 33401_____

(f) In any post - conviction proceeding __David W. Collins, Esquire, P.O. Box 541, Monti-__

__cello, Florida 32345_____

(g) On appeal from any adverse ruling in a post - conviction proceeding _____same as above_____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and the same time?

Yes  ☒   No  ☐   (5 counts on one Information)

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgement under attack?

Yes  ☐   No  ☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) Give date and length of the above sentence: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgement which imposed the sentence to be served in the future?

Yes  ☐       No  ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)
David W. Collins, Esquire
Florida Bar No. 475289

Law Offices of David W. Collins
P.O. Box 541
Monticello, Florida 32345
Phone: (850) 997-8111
Facsimile: (850) 997-5852

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

__March 18, 2006___
(date)

_____
Signature of Petitioner

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

Edward Frederick

## DEFENDANTS

James C. McDonough, Interim Secretary, Florida Department of Corrections; Charles J. Crist, Jr., Fla. Atty. Gen'l

**(b)** County of Residence of First Listed Plaintiff  Okeechobee, FL
(EXCEPT IN U.S. PLAINTIFF CASES)

Attorney General of Florida
County of Residence of First Listed Defendant   Leon, FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

06-80278

Law Offices of David W. Collins
310 North Jefferson Street
Monticello, Florida 32345-2057
(850) 997-8111

Attorneys (If Known)

David W. Collins, Esquire

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☒ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☒ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO      b) Related Cases ☐ YES ☒ NO

JUDGE                              DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. § 2254
Petition for Writ of Habeas Corpus by Prisoner in State Custody

LENGTH OF TRIAL via ____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23      DEMAND $      CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   March 24, 2006

FOR OFFICE USE ONLY

AMOUNT  $5.00      RECEIPT # 721857      IFP